UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| iCORE GLOBAL, LLC; iCG-DENVER, LLC; and SAMANTHA MUETING<br><br>        Plaintiffs,<br><br>    v.<br><br>MILLENNIUM COMMERCIAL ADVISORS, LLC; AVISON YOUNG (CANADA) INC.; AVISON YOUNG (USA) INC.; AVISON YOUNG - NORTHERN CALIFORNIA, LTD; ALEC WYNNE; and JUSTIN RAYBURN<br><br>        Defendants.<br>_____/ | No. C-14-3393 EMC<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO STAY**<br><br>**(Docket No. 33)** |

    This action arises out of a business dispute between Plaintiffs iCORE Global, LLC ("iCore") and its CEO Ms. Samantha Mueting and Defendants Millennium Commercial Advisors, LLC ("Millennium"), various Avison Young entities, Mr. Alec Wynne, and Mr. Justin Rayburn. Pending before the Court is Defendants Wynne, Rayburn, and Millennium's motion to stay or, in the alternative, compel arbitration. Defendants argue that a stay of this action is appropriate in light of the pendency of a previously filed lawsuit in Colorado state court that encompasses the parties' dispute. The Court agrees and therefore declines to reach Defendants' alternative arbitration arguments. For the foregoing reasons, Defendants' motion is **GRANTED** and this case is **STAYED**.

///

///

///

## II.   FACTUAL AND PROCEDURAL BACKGROUND

A.   Relevant Allegations in the Operative Second Amended Complaint

In 2010, Mr. Alec Wynne and Justin Rayburn approached the CEO of iCORE, Ms. Samantha Mueting, to seek her assistance in obtaining an international scope of work for Western Union. Second Amended Complaint ("SAC") ¶ 15. iCORE and Ms. Mueting had built an "enormous amount of goodwill with Western Union" as a result of their prior work with Western Union. *Id.* As a result of this contact, iCORE and Ms. Mueting agreed that Mr. Wynne and Mr. Rayburn would become "part of the iCORE team." *Id.* ¶ 16. To this end, numerous written agreements were executed between iCORE and Mr. Wynne ad Mr. Rayburn, including a June 2010 Joint Venture Agreement, Master Trademark License Agreement, and an Operating Agreement, among others (the "iCORE Contracts"). *Id.* ¶ 17. Further, based on representations of Mr. Wynne and Mr. Rayburn, Plaintiffs organized Plaintiff iCG-Denver under Delaware law as the "joint venture under which iCORE and Defendant Millennium, the joint venturers, operated." *Id.* ¶ 18. Millennium is alleged to be an entity wholly owned by Mr. Wynne and Mr. Rayburn. *Id.* The agreements entered into by the parties contained forum selection clauses which selected the state and federal courts of Santa Clara County, California to be the exclusive jurisdiction for disputes arising under the contracts. *Id.* ¶ 12.

From 2010 through 2012, Plaintiffs assisted Millennium, Mr. Wynne, and Mr. Rayburn in obtaining overseas work with Western Union. *Id.* ¶ 19. Plaintiffs invested several hundreds of thousands of dollars in building iCG-Denver into a viable, recognized company. *Id.* ¶ 20. Following the success of this joint venture, Plaintiffs allege that Millennium, Mr. Rayburn, and Mr. Wynne furthered a "secret conspiracy" with the Avison Young Defendants to breach the various contracts with iCORE. *Id.* ¶ 21. In so doing, Defendants allegedly obtained money, clients, and contracts in violation of the operative contracts with iCORE. *Id.* The Defendants demanded that Plaintiffs "agree to amend the iCORE Contracts, without consideration, threatening to close the business otherwise." *Id.* ¶ 22. Because Plaintiffs believed they would not recover the capital investment they had made in making the iCG-Denver joint venture operational, they were forced to give into the Defendants' demand. *Id.* ¶ 23. Plaintiffs conditioned their agreement to demands on

Defendants' agreement to work with iCORE for at least two additional years so that Plaintiffs could recover their capital investment. *Id.*

In January 2012, the Joint Venture Agreement was amended to reflect these changes. The amended Joint Venture Agreement required, among other things, that : (1) Plaintiffs waive their rights to recoup money invested into the iCG-Denver entity; (2) Plaintiffs lower their commission; and (3) that Plaintiffs be demoted to non-management roles so that the Defendants could "gain an upper hand and unfettered control of the affairs of iCG-Denver. *Id.* ¶ 24. The amended agreement also required that Plaintiffs have no further contact with Western Union without the prior written consent of iCG-Denver in its sole and absolute discretion. *Id.* ¶ 25.

Despite the concessions made in the amended Joint Venture Agreement, after only a couple of months, the Individual Defendants advised Plaintiffs of their intention to dissolve the iCG-Denver relationship – despite the agreement to continue their relationship with iCORE for an additional two years. *Id.* ¶ 27. Plaintiffs believe that the Individual Defendants had secretly negotiated a separate arrangement with Defendant Avison Young. *Id.* ¶ 28. The Individual Defendants then met among themselves and voted to dissolve iCG-Denver, effective November 2, 2012. *Id.*

However, despite dissolving iCG-Denver, Defendants Wynne and Rayburn have failed to formally dissolve the entity and have failed to properly windup its affairs. *Id.* ¶ 29. Instead, and in violation of the iCG-Denver Operating Agreement, the Individual Defendants and Avison Young have continued to conduct business through iCG-Denver. *Id.* ¶ 29. Plaintiffs allege that Defendants have "improperly and unlawfully held themselves out as the owners of the iCORE Trademarks" as well as improperly representing that they are the "owners and/or Plaintiff's authorized managers of iCORE." *Id.* ¶ 31. On May 7, 2013, Plaintiffs' counsel contacted Avison Young and demanded that it cause Mr. Wynne and Mr. Rayburn (principals at Avison Young) to cease and desist from utilizing iCORE's trademarks, representing themselves as owners of iCG-Denver, representing that they were managing partners in iCG Denver or iCORE, or contacting iCORE's clients. *Id.* ¶ 33.

Plaintiffs in this action assert 12 causes of action: (1) Trademark infringement; (2) unfair competition under the Lanham Act, 15 U.S.C. § 1125(a); (3) false and misleading advertising in violation of Cal. Bus. & Prof. Code §§ 17500, 17535; (4) unfair competition in violation of Cal.

3

Bus. & Prof. Code § 17200; (5) common law unfair competition; (6) breach of contract against Millennium, Wynne, and Rayburn; (7) breach of fiduciary duty against Millennium, Wynne, and Rayburn; (8) misappropriate of trade secrets; (9) conversion; (10) intentional interference with contractual relations; (11) intentional interference with prospective economic relations; and (12) intentional misrepresentation.

B.     The Colorado Action

This is not the first action that resulted from the relationship alleged above. On May 9, 2013, iCG Denver, LLC ("iCG") filed a complaint in Colorado state court ("Colorado Complaint") against Samantha Mueting and iCORE Global, LLC ("iCORE"). *See* Colorado Complaint (Dkt. No. 35-2). In the Colorado Action, iCG Denver – with Mr. Rayburn purporting to act as a "Managing Member" of that entity – alleged that when Mr. Rayburn and Mr. Wynne decided to wind down and dissolve iCG Denver in 2012, a dispute arose about their power to do so. Colorado Complaint ¶ 17, 19. To resolve this dispute, iCG Denver alleged that iCG Denver, iCORE, Mr. Rayburn, Mr. Wynne, and Ms. Mueting resolved the dispute through a Settlement Agreement. *Id.* ¶ 20. This agreement terminated the relationship between iCG Denver, Rayburn and Wynne had with iCORE and released them from any and all covenants and obligations, as well as barred any claims which could have been brought by iCORE or Ms. Mueting against iCG Denver, Rayburn, Wynne, Millennium. *Id.* ¶ 21. Further, it prospectively waived any *future* claims iCORE or Ms. Mueting may have had against these entities. *See* Dkt. No. 34-5, ¶ 2.a (providing that iCORE and Ms. Mueting were releasing, *inter alia*, "any claim . . . relating to the Agreement or Operating Agreement and/or the relationship between iCORE and/or Mueting and Wynne, Rayburn, MCA and/or iCG-Denver *that may arise now or in the future* . . ." (emphasis added)). The Settlement Agreement contained a choice of law provision selecting Colorado law to govern interpretation and enforcement. *Id.* ¶ 6

Notwithstanding the Settlement Agreement, iCG Denver alleged that Ms. Mueting (both individually and as an agent of iCORE) violated the agreement by "engag[ing] in intentional acts . . . intended to interfere with existing and prospective relationships" between iCG Denver and its customers, "impede the winding down of ICG, divert customers and money from them to Mueting and/or iCORE, and obtain unauthorized access to and control of ICG's bank account." Colorado

Complaint ¶ 23. These actions generally are alleged to have involved Ms. Mueting (as an agent of iCORE) misrepresenting to customers of ICG-Denver, the Colorado Secretary of State, and iCG Denver's bank that she was an authorized agent, president, managing member and shareholder of iCG Denver as well as the sole individual authorized to act on its behalf. *See, e.g.*, *id.* ¶¶ 28, 32. iCG Denver asserted four substantive claims for relief against Ms. Mueting and iCORE: (1) Breach of Contract; (2) fraud/constructive trust; (3) breach of fiduciary duty; and tortious interference. *Id.* at 4-6.

On May 10, 2013, the Colorado state court issued a temporary restraining order against Ms. Mueting and iCORE. Dkt. No. 35-1, at 5. On July 1, 2013, Ms. Mueting and iCORE answered the Colorado Complaint and asserted third-party claims against Millennium, Mr. Wynne, and Mr. Rayburn ("Colorado Counterclaims"). *See* Colorado Counterclaims (Dkt. No. 35-3). The Colorado Counterclaims contained various allegations – similar to those raised in this action – about the creation of the iCG Denver joint venture, Mr. Rayburn and Mr. Wynne's allegedly forcing amendments to the various iCORE Contracts, and their alleged failure to abide by the amended agreements by seeking to dissolve iCG Denver within months of those agreements being signed. *See generally id.* ¶¶ 7-24. Ms. Mueting and iCORE asserted counterclaims for: (1) breach of contract; (2) "Unfair Trade Practices" (under both federal and state law); (3) "Unlawful Use of Trademarks"; (4) "Misappropriation of Trade Secrets and Confidential Information"; (5) Conversion; (6) Intentional interference with contract; (7) intentional misrepresentation; and (8) breach of fiduciary duty.

In October 8, 2013, Ms. Mueting and iCORE moved to dismiss the Colorado action based on the forum selection clause in the Joint Venture Agreement and License Agreement. *See* Dkt. No. 35-5. These agreements, Ms. Mueting and iCORE argued, contained forum selection clauses which generally provided that the "parties hereby submit to the exclusive jurisdiction and venue of the state and federal courts in Santa Clara County, California . . . for any dispute or claim arising out of, in relation to, or in connection with this Agreement . . . ." *Id.* at 4. The Colorado state court granted this motion on November 15, 2013 and dismissed the Colorado state action. Dkt. No. 35-6. Dkt. No. 35-6.

1    Approximately eight months later, on July 25, 2014, iCORE and Ms. Mueting filed the
2 instant action. *See* Dkt. No. 1.
3    On September 18, 2014, the Colorado Court of Appeals overturned the Colorado state trial
4 court's dismissal of the Colorado action and remanded the Colorado action to that court. *See iCG*
5 *Denver v. Mueting*, No. 13CA2102 (Colo. Ct. App. Sept. 18, 2014) ( Dkt. No. 35-7). In essence, the
6 Colorado Court of Appeal found that the state court had applied the incorrect standard for evaluating
7 the enforceability of a forum selection clause and remanded to apply the correct standard. *Id.* at 9.
8 In light of this reversal and remand, Defendants in this action have moved to stay this action pending
9 resolution of the Colorado action.

## III. DISCUSSION

11    In the instant motion, Defendants Millennium, Wynne and Rayburn seek to stay the instant
12 action pending the outcome of the Colorado Action or, in the alternative to compel arbitration in
13 light of the arbitration provisions contained in the various iCORE Contracts. Plaintiffs have
14 indicated that they do not oppose a stay in this case in light of the Colorado Court of Appeal's
15 remand of the Colorado action. *See* Dkt. No. 40, at 3-4. Nonetheless, Plaintiffs seek to impose three
16 conditions on the stay. The Court finds that a stay of this action pending the outcome of the
17 Colorado Action is appropriate. Because the Court so holds, the Court need not address Defendants'
18 alternative arbitration-related arguments.

19    Under the *Colorado River* doctrine, a federal court may abstain from exercising its
20 jurisdiction in favor of parallel state proceedings when doing so would serve the interests of "[w]ise
21 judicial administration, giving regard to the conservation of judicial resources and comprehensive
22 disposition of litigation." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800,
23 818 (1976). A state court action can be deemed a "parallel state proceeding" even if it is not
24 identical to the federal action – all that is required is that the state proceeding be "substantially
25 similar" to the federal action. *See, e.g.*, *Smith v. Central Ariz. Water Conservation Dist.*, 418 F.3d
26 1028, 1033 (9th Cir. 2005) ("'[E]xact parallelism' between the state and federal proceedings is not
27 required . . . ."); *see also McCreary v. Celera Corp.*, No. 11-1618 SC, 2011 WL 1399263, at *3

(N.D. Cal. Apr. 13, 2011) ("'[Exact parallelism]' between the state and federal actions is not required; it is enough if the two actions are 'substantially similar.'").

If the federal and state actions are parallel, the Court should consider the following non-exclusive factors to determine if a stay is appropriate under *Colorado River*: (1) whether the state court first assumed jurisdiction over property; (2) inconvenience of the federal form; (3) the desirability of avoiding piecemeal litigation; (4) the order in which jurisdiction was obtained by the concurrent forums; (5) whether federal law or state law provides the rule of decision on the merits; (6) whether the state court proceedings are inadequate to protect the federal litigant's rights; (7) whether exercising jurisdiction would promote forum shopping. *See Holder v. Holder*, 305 F.3d 853, 867 (9th Cir. 2002).

Ultimately, the Ninth Circuit has noted that the *Colorado River* abstention doctrine is a "narrow exception to 'the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them.'" *Id.* Accordingly, if there is "substantial doubt" as to whether the state proceedings will resolve the federal action, a stay is improper under *Colorado River*:

> When a district court decides to dismiss or stay under *Colorado River*, it presumably concludes that the parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties. If there is any substantial doubt as to this, it would be a serious abuse of discretion to grant the stay or dismissal at all . . .

*Intel Corp. v. Advanced Micro Devices, Inc.*, 12 F.3d 908, 913 (9th Cir. 1993). Accordingly, as a general rule, a "federal court may not abstain from jurisdiction simply because there are parallel proceedings in a state court." *Sutterfield v. Micromuse, Inc.*, No. C04-0893, 2004 WL 6058065, at *5 (N.D. Cal. July 13, 2004).

The Colorado Action and this action are substantially similar with significant overlap in both legal and factual issues. Both cases present similar causes of action brought by Ms. Mueting and iCORE asserting, among other things, that Mr. Wynne and Mr. Rayburn breached the various iCORE agreements and violated the Lanham Act and related state laws. Both actions arise out of the same core of operative facts as detailed above. *See, e.g.*, *Clark v. Lacy*, 376 F.3d 682, 687 (7th Cir. 2004) (finding federal and state actions were parallel as "they rely on the same factual predicate

to raise substantially similar legal issues against substantially similar parties"). Further, following the remand by the Colorado Court of Appeals, the Colorado Action remains pending. Accordingly, this action and the Colorado Action qualify as parallel proceedings.

As to whether exceptional circumstances warrant a stay, a number of the factors identified by the Ninth Circuit favor the issuance of a stay. First, it is undisputed that the Colorado Action was filed first, meaning that the Colorado state court was the first to obtain jurisdiction over this dispute. Second, as to the convenience of the federal forum, the Court notes that none of the parties to this litigation are from this state or district. Rather, the parties are either residents of (or have their principal place of business in) Texas (iCORE and Ms. Mueting), Colorado (Mr. Wynne, Mr. Rayburn, Millennium, Avison-Young - Northern California, Ltd., iCG-Denver LLC), Illinois (Avison Young (USA) Inc.), or Canada (Avison Young (Canada) Inc.). *See* SAC ¶¶ 1-9. It thus appears likely that most of the witnesses and evidence underlying this dispute are outside this District. Third, the desirability of avoiding piecemeal litigation weighs in favor of granting a stay. As just mentioned, these two actions involve an almost identical factual dispute and raise questions of contract interpretation over the same contracts. Accordingly, a number of identical (or substantially similar) legal and factual questions will be present in both actions. Courts have cautioned against conflating "piecemeal litigation" with "duplicative litigation" (with the latter being controllable through doctrines of res judicata and collateral estoppel). *See, e.g.*, *Saucier v. Aviva Life & Annuity Co.*, 701 F.3d 458, 464 (5th Cir. 2012). Nonetheless, even where principles of res judicata and collateral estoppel would apply, the risks of duplicative litigation and an unseemly race to judgment weigh in favor of abstaining." *Colony Ins. Co. v. Danica Group, LLC*, No. 13-CV-1714 (RRM) (MDG), 2014 WL 4417353, at *7 (E.D.N.Y. Sept. 8, 2014) ("[E]ven where principles of res judicata and collateral estoppel would apply, the risks of duplicative litigation and an unseemly race to judgment weigh in favor of abstaining.").

Fourth, while the dispute between the parties raise both federal and state causes of action, there appears to be a threshold question governed by Colorado law. The Settlement Agreement executed by Ms. Mueting and iCORE includes a provision stating that:

> iCORE and Mueting release Wynne, Rayburn, [Millennium] and iCG-Denver . . . from any and all covenants, obligations, claims, damages, demands, controversies, costs, losses, debts, expenses, and rights of iCORE and Mueting arising from any and all facts, events, services or transaction relating to the Agreement or Operating Agreement and/or the relationship between iCORE and/or Mueting, and Wynne, Rayburn, [Millennium] and/or iCG-Denver, or any claim that were or could have been brought by iCORE or Mueting against Wynne, Rayburn, MCA and/or iCG-Denver relating to the Agreement or Operating Agreement and/or the relationship between iCORE and/or Mueting and Wynne, Rayburn, [Millennium] and/or iCG-Denver that may arise now or in the future . . . .

Dkt. No. 34-5, at 3. The Settlement Agreement also provides that all matters regarding the enforcement and interpretation of it would be governed by Colorado Law. *Id.* at 4. Accordingly, the threshold question as to whether Ms. Mueting and iCORE agreed to prospectively release the claims they now seek to assert is one governed by Colorado law. Further, to the extent that the Settlement Agreement is inapplicable or unenforceable (as Ms. Mueting and iCORE contend), the operative agreements under which they sue all provide that they are to be interpreted in accordance with Delaware law. *See* Dkt. No. 34-1, at 11, ¶ 9.2; Dkt. No. 34-3, at 19, ¶ 14.3. Of course, to the extent that Ms. Mueting and iCORE assert Lanham Act claims in their Colorado Action counterclaims, these claims would be governed by federal law. Despite this fact, it is apparent that substantial questions of state law (namely contract interpretation) will play a large role in resolving both disputes. Fifth, the Court finds that the Colorado Action presents an adequate forum to protect the federal litigants' (Ms. Mueting and iCORE) rights, demonstrated by the fact that neither party opposes the stay in principle (subject to the qualifications discussed below).

There are, however, considerations militating against a stay in this case. First, the Court finds that this Court exercising jurisdiction would not promote forum shopping. Ms. Mueting and iCORE filed the instant action only after the Colorado state court had dismissed the action before it pursuant to forum selection clauses in the iCORE contracts which state that the federal and state courts in Santa Clara County are to be the exclusive venue for resolving disputes arising from those contracts. At the time this action was filed, the Colorado Court of Appeal had not reversed the trial courts' judgment. Given this procedural history, the filing of the lawsuit in this District was not unreasonable and the Court concludes that Ms. Mueting and iCORE did not engage in forum

shopping by bringing this suit. Second, while important state law questions exist in this litigation, the Court cannot ignore the fact that Plaintiffs are asserting federal claims. This dispute does involve federal causes of action– specifically Lanham Act claims. Courts have recognized that this cuts against the issuance of a stay – even where the state court has concurrent jurisdiction over those claims. *See, e.g.*, *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 26 (1983) ("[T]he presence of federal-law issues must always be a major consideration weighing against surrender [of jurisdiction]."); *see also Epps v. Lauderdale County*, 139 F. Supp. 2d 859, 869 (W.D. Tenn. 2000) ("Federal jurisdiction does not require justification, and therefore concurrent jurisdiction over the application of federal law does not necessarily weigh in favor of abstention.").

Further, the Court is cognizant of the Ninth Circuit's admonishment that *Colorado River* abstention is reserved for "exceptional circumstances" and that federal actions should not be stayed where there is "substantial doubt" as to whether the state court action will be an "adequate vehicle for the complete and prompt resolution of the issues between the parties." *Intel Corp.*, 12 F.3d at 913. Here, there is nothing prohibiting the Colorado state court from resolving the core dispute between these parties. To the extent that Ms. Mueting and iCORE are seeking to pursue Lanham Act claims in the Colorado Action,[1] such claims would be cognizable by the state court. *See Silvaco Data Systems, Inc. v. Tech. Modeling Associates, Inc.*, 896 F. Supp. 973 (N.D. Cal. 1995) (noting in the *Colorado River* context that "concurrent jurisdiction under the Lanham Act is available in state court"). At the same time, there is *some* doubt as to whether the Colorado action will ever proceed to a merits determination. The state court has already once dismissed the case on the basis of a forum selection clause in the various iCORE contracts. While the Court of Appeals reversed, it remanded for the state court to reconsider its determination in light of the proper standard. There is a risk that the state court, after months of delay, will arrive at the same determination, dismiss the case, spawning another appeal to the Colorado Court of Appeals. Such a result could hardly be

---

[1] The "unlawful trademark use" counterclaim in Colorado does not expressly reference federal law or the Lanham Act generally, but rather states that the counterclaim defendants "violated the trademark laws" by continuing to use iCORE's trademarks. Colorado Counterclaim ¶ 29.

deemed a "complete and prompt resolution of the issues between" these parties. *Intel Corp.*, 12 F.3d at 913.

On balance, the Court finds that a stay at this time is appropriate under *Colorado River*. The threshold issues of the enforceability and applicability of the iCORE Contract venue provisions and the Settlement Agreements have been raised and argued before the Colorado state court. Proceeding with this action while an almost identical and earlier filed state court action proceeds would not comport with principles of "wise judicial administration" or "conservation of judicial resources." *Colorado River*, 424 U.S. at 818. Plaintiffs acknowledge this implicitly by not opposing the stay in this case.

Nonetheless, Plaintiffs seek to impose three conditions on the stay. First, Plaintiffs contend that this stay should only remain in place pending the Colorado court's resolution of the enforceability of the forum-selection clauses in the iCORE contracts in light of the Settlement Agreement. Dkt. No. 40, at 5. They contend that once the Colorado court rules on this issue, the stay in the court should be lifted. Plaintiffs are concerned that the time it would take for the trial court to rule on this issue, and the appellate court to consider any appeal, would result in witness memory fading and other evidentiary losses. Plaintiffs concern is a reasonable one, but the Court will not automatically lift the stay once the Colorado trial court rules on this threshold matter. Rather, the parties will, after the Colorado court issues its ruling, promptly notify the Court by filing a joint letter that advises the Court of the Colorado court's action as well as their respective positions on how this case should proceed. The Court will determine the continued viability of the stay at that point in light of the Colorado trial court's actions.

Second, Plaintiffs request that Defendants (including the Avison-Young Defendants) be required to maintain their litigation holds (particularly with respect to ESI) during the stay. *Cf. Pi-Net Int'l, Inc. v. Hertz Corp.*, No. CV 12-1002, 2013 WL 7158011, at *5 (C.D. Cal. June 5, 2013) (ordering defendants to maintain litigation holds during the pendency of a stay for *inter partes* review). Defendants do not oppose this request, but maintain it should be reciprocal such that Plaintiffs also be required to maintain their litigation holds and preserve ESI evidence. The Court

will order *all* parties to maintain their litigation holds in this matter and to take steps to preserve potentially relevant evidence, including ESI.

Finally, Plaintiffs request that the Court require the parties to exchange their Rule 26 initial disclosures notwithstanding the stay. Plaintiffs contend that this information will help the parties determine which material should be subject to a litigation hold and preserved pending the outcome of the Colorado action. Defendants oppose this, arguing it is unnecessary (in light of the initial disclosures that have occurred already in the Colorado action). The Court finds it is prudent for the parties to comply with Rule 26 at this time so as to minimize any future delay. It orders the parties to exchange initial disclosures and further orders the parties to meet and confer to arrive at a timing schedule for this exchange. While Defendants are correct that initial disclosures have occurred in the Colorado action and that these will substantially overlap with any initial disclosures in this case, it is notable that the Avison-Young Defendants are not parties to the Colorado Action. Initial disclosures will help ensure that any relevant information as to those entities are preserved and maintained. Further, to the extent disclosures have already been made in connection with the Colorado action, there is little burden to comply with Rule 26 in this action.

### III.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' motion to stay pursuant to *Colorado River*.[2] This action is hereby **STAYED**. In light of this ruling, the Court does not address Defendants' motion to compel arbitration.

---

[2] In addition to their *Colorado River* arguments, Defendants argue that a stay is appropriate under the "first-to-file rule." This doctrine is a judicially created rule which permits "a district court to decline jurisdiction over an action when a complaint involving the same parties and issues has already been filed in another district." *Hilton v. Apple Inc.*, No. C13-2167 EMC, 2013 WL 5487317, at *3 (N.D. Cal. Oct. 1, 2013). Courts are split on whether the first-to-file rule can be applied where the first filed action is a *state* court action as opposed to another federal action. *Compare Just Film, Inc. v. Merchant Services, Inc.*, No. 10-1933 CW, 2012 WL 10555 (N.D. Cal. Jan. 3, 2012) (noting that the first to file rule has "evolved from and is applied in cases involving intra-federal conflicts" and is "not necessarily the guidepost for the setting here, where parallel litigation is pending in federal and state courts" (citation and internal quotation marks omitted)), *with United Artists Theatre Circuit, Inc. v. FCC*, 147 F. Supp. 2d 965 (D. Ariz. 2000) (noting that the first to file rule's principle "is no less applicable when the courts set in competition against each other are a federal district court and a state court").

Insofar as the Court has found a stay under *Colorado River* to be appropriate, it need not address the question of whether the first-to-file rule may be applied in the face of an earlier filed *state* court action.

In addition, the parties are **ORDERED** as follows:

- Within one week of the Colorado trial court issuing an order on the question of the enforceability of the forum selection clauses in the iCORE contracts, the parties shall file a joint statement in this case advising the Court of their respective positions of how this case should proceed.

- All parties are ordered to maintain their litigation holds and to maintain and preserve any potentially relevant evidence in this case.

- The parties are ordered to meet and confer and arrive at a schedule for the exchange of initial disclosures in this action.

IT IS SO ORDERED.

Dated: January 14 , 2015

_____
EDWARD M. CHEN
United States District Judge